IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

USDC- GREENBELT
'26 SEP 17 AM 10:11

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** LKG 26 CR 315 |
| | * | |
| **v.** | * | **(Conspiracy to Commit Bribery of a Public Official and Commit Honest Services Wire Fraud, 18 U.S.C. §§ 371, 201(b)(1), 201(b)(2), 1343, and 1346; Forfeiture, 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c))** |
| **JAMES E. LEE, SR.,** | * | |
| **Defendant.** | * | |
| | ******* | |

# INFORMATION

THE UNITED STATES CHARGES THAT:

## I. Background

1. The United States Postal Service ("USPS") was an independent agency of the Executive Branch of the United States Government and headquartered in Washington, D.C.

2. The defendant, **JAMES E. LEE, SR.** ("**LEE**"), a resident of the State of Maryland, was employed by the USPS from on or about July 15, 2000, until on or about May 28, 2024. **LEE** served as an Expedited Packaging Specialist until on or about July 30, 2022, when **LEE** was promoted to Product Management Specialist.

3. JAMES E. LEE JR. ("LEE JR."), a resident of the State of Maryland, was the owner of LEE CONSULTING GROUP, LLC ("LCG"), a strategic and environmental consultant for the packaging industry. LCG was incorporated in Delaware on or about April 9, 2020. COMPANY A was a packaging solutions company and corrugated box manufacturer headquartered in Pennsylvania. COMPANY A hired LEE JR. in or about July 2018, shortly after he graduated from

college. COMPANY A initially paid LEE JR.'s salary. Beginning in or about mid-2019, a company affiliated with COMPANY A's Chief Executive Officer, EXECUTIVE A, began paying LEE JR.'s salary.

4. JAMES GRIFFIN was a contractor for COMPANY B, a packaging solutions company and corrugated box manufacturer headquartered in Michigan. GRIFFIN served as COMPANY B's national account manager and exclusive sales representative with the USPS.

5. COMPANY C was a packaging solutions company and corrugated box manufacturer headquartered in Georgia. On or about September 19, 2019, COMPANY C hired EXECUTIVE C1 as a senior executive and promoted EXECUTIVE C1 to President and Chief Operating Officer on or about January 1, 2020. EXECUTIVE C2 was COMPANY C's Vice President of Sales and Marketing.

6. COMPANY D was a label manufacturing company headquartered in Connecticut. EXECUTIVE D1 served as COMPANY D's President and Chief Executive Officer, and EXECUTIVE D2 served as COMPANY D's Marketing and Business Development Director.

## II. <u>USPS Expedited Packaging Supplies</u>

7. The USPS provides expedited packaging supplies ("EPS") specially designed for use with its domestic and international priority mail express and priority mail services at no additional cost to customers. EPS includes corrugated containers, envelopes, and a range of pressure-sensitive labels and decals. All EPS are preprinted with the logo of the corresponding USPS brand, to be easily identified in the mail stream, improving mail processing operations. The printed graphics and logo also act as a promotional tool to build brand awareness among customers.

8. The EPS program is managed by the USPS's Packaging Services team within the Shipping and Commerce Product Management Department. EPS are produced by third-party manufacturers that are contracted by the USPS to produce the materials to the designs and specifications of the Packaging Services team. The Packaging Services team also evaluates technical proposals and sample materials submitted by prospective suppliers and provides feedback to the USPS contracting officials for EPS contracts.

9. As part of the USPS's procurement process, the assigned Contracting Officer often appoints a Contracting Officer's Representative ("COR") to handle the day-to-day administration of the contract. The COR serves as the USPS's point of contact with the supplier on all routine matters. A COR is responsible for the technical aspects of the project and for acting as the technical liaison with the supplier. The COR has many other responsibilities, including contract management, reporting on quality, safety and other performance aspects and various upward reporting responsibilities.

10. **LEE's** responsibilities included serving as the COR on several USPS contracts to provide EPS. **LEE** also served as the chairperson or lead on several technical evaluation teams used by the USPS during the solicitation and procurement process to evaluate the technical aspects of bid proposals from prospective suppliers. The technical evaluation team chairperson is responsible for preparing the team's recommendation and submitting it to the Contracting Officer.

**COUNT ONE**
**(Conspiracy)**

11. The allegations set forth in paragraphs 1-10 are realleged and incorporated by reference as though fully set forth herein.

12. Beginning in or about mid-2018, and continuing until in or about November 2023, in the District of Maryland and elsewhere, the defendant, **JAMES E. LEE, SR.**, along with LEE JR., and others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree together and with each other:

a. To engage in bribery, that is, to directly and indirectly, corruptly give, offer, and promise anything of value to a public official and to any other official and entity, with intent to influence an official act and with intent to influence such public official to commit and aid in committing, and collude in, and allow, any fraud, and make opportunity for the commission of any fraud, on the United States, in violation of 18 U.S.C. § 201(b)(1)(A) and (B).

b. To engage in bribery, that is, to directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person or entity in return for being influenced in the performance of any official act and being influenced to commit and aid in committing, and collude in, and allow, any fraud, and make opportunity for the commission of any fraud, on the United States, in violation of 18 U.S.C. § 201(b)(2)(A) and (B).

c. To devise and intend to devise and participate in a scheme and artifice to defraud and deprive the USPS and the citizens of the United States of their intangible right to the honest services of **LEE**, a high-level USPS employee in a sensitive official position, through bribery and kickbacks; the scheme or artifice to defraud involved a material misrepresentation,

false statement, false pretense, or concealment of fact; the defendant devised and participated in the scheme knowingly and with the specific intent to defraud; and, in advancing, furthering, and carrying out the scheme to defraud, the defendant transmitted, and caused to be transmitted, any writing, signal, or sound by means of a wire communication in interstate or foreign commerce, in violation of 18 U.S.C. §§ 1343 and 1346.

**Manner and Means of the Conspiracy**

13. The conspiracy was carried out through the following manner and means, among others. **LEE**, LEE JR., and others agreed to engage in corrupt schemes in which **LEE** steered the procurement process for certain EPS contracts so they would be awarded to, or retained by, COMPANIES A-D. **LEE** steered the procurement process by (a) providing preferential treatment and competitive advantages to COMPANIES A-D, including reviewing draft technical proposals and disclosing to them confidential USPS information regarding pricing and other issues; (b) using **LEE**'s position to perform official acts and advocate for, recommend, and influence other USPS officials to select COMPANIES A-D for EPS contracts and modifications; and (c) using LEE JR. and LCG as an intermediary for **LEE** and COMPANIES A-D to assist and conceal **LEE**'s efforts to steer the procurement process. **LEE** agreed to perform, and did perform, official acts—and advised other officials, knowing and intending such advice to form the basis for official acts—on an as-needed basis for COMPANIES A-D as opportunities arose. **LEE**'s official acts, and **LEE**'s efforts to influence other officials, benefited COMPANIES A-D regarding the awarding, modifying, administering, and supervising of the USPS EPS contracts.

14. In exchange, COMPANY A hired and paid LEE JR. as a salaried employee and COMPANIES B-D retained and paid LEE JR. and LCG to provide consulting services. In total,

LEE JR. received approximately $433,000 in salary from COMPANY A (and EXECUTIVE A's affiliated company), which included bonuses on or about August 31, 2020 (approximately $25,000); on or about December 31, 2020 (approximately $15,000); and on or about July 15, 2022 (approximately $20,000). GRIFFIN retained and paid LEE JR. and LCG to provide consulting services for in exchange for approximately $51,103 from COMPANY B; LEE JR. AND LCG received approximately $58,556 from COMPANY C; and approximately $13,087.50 from COMPANY D for consulting services.

**Purpose of the Conspiracy**

15. The purpose of the conspiracy was: (a) to use **LEE**'s official position with the USPS to benefit and enrich **LEE**, LEE JR., and others, including COMPANIES A-D, through bribery and kickback schemes; (b) to defraud the USPS and citizens of the United States and deprive them of their intangible right to the honest services of **LEE**, a supervisory-level USPS employee, through bribes and kickbacks; and (c) to conceal the nature and purpose of the schemes.

**Overt Acts**

16. In furtherance of the conspiracy and to effect its objects, **LEE**, LEE JR., and others committed the following overt acts, among others, in the District of Maryland and elsewhere:

**I. USPS Contracts with COMPANY A**

17. Between in or about mid-2018 and in or about late 2020, **LEE**, LEE JR., EXECUTIVE A, and others discussed pricing, including confidential or internal USPS pricing or procurement information, for specific EPS products, often before the USPS had even issued the contract solicitations.

18. On or about April 17, 2019, a week after **LEE** received internal notice regarding an EPS solicitation for priority mail boxes (valued at over $51 million), EXECUTIVE A and LEE JR. had a telephone call that lasted approximately 24 minutes. During the call, there was an overlapping call between **LEE** and EXECUTIVE A that lasted approximately 15 minutes, suggesting a three-way call between **LEE**, LEE JR., and EXECUTIVE A.

19. On or about June 24, 2019, after LEE JR. had multiple telephone calls with **LEE**, LEE JR. emailed EXECUTIVE A, stating in part: "The pricing that was verbally mentioned via this quote got a good acceptance today and should sell. . . . Can you form a separate official email to [**LEE**] and send it off to him? Stating, 'Based on yours and his conversation. . . .'"

20. On or about December 6, 2019, **LEE** emailed the evaluation for the priority mail box contract to the USPS contracting office. The technical evaluation ranked COMPANY A's bid proposal the best of six proposals. **LEE** and LEE JR. had two telephone calls that day.

21. On or about December 23, 2019, EXECUTIVE A emailed LEE JR., stating in part, "Spoke with [the USPS Contracting Office] . . . they have asked me to review pricing one last time for any additional economy we might be able to offer[.]" LEE JR. responded in part, "Sounds good. Would like for the three of us to talk. . . ." LEE JR. later emailed EXECUTIVE A, stating in part, "If you call me direct I will [c]onference [**LEE**] in."

22. On or about March 30, 2020, **LEE** and USPS contracting officials signed an award recommendation for the priority mail box contract, selecting COMPANY A as the primary supplier.

23. On or about March 3, 2021, **LEE** texted LEE JR., stating in part: "Someone from [a business associated with EXECUTIVE A] just asked for a debriefing on why they were not

awarded [a particular USPS contract] … What the hell and who asked and does [EXECUTIVE A] know about this? Also they need to know not to mention your name." LEE JR. replied, "Check your personal email."

24. Between on or about July 10, 2021, and on or about November 12, 2021, EXECUTIVE A exchanged emails with LEE JR. regarding a draft request to modify and increase prices under the priority mail box contract previously awarded to COMPANY A. In several of the emails, EXECUTIVE A requested that LEE JR. review the draft language with **LEE**, who was serving as the COR on the contract.

25. On or about October 23, 2021, after LEE JR. received pricing recommendations from **LEE**, LEE JR. emailed EXECUTIVE A, stating: "Please see attached. Highlighted in red you will see the changes recommended for the final draft. Recommendations have been made to propose a higher % and negotiate down – [the USPS contracting office] will negotiate this with you – almost certain!"

26. On or about May 11, 2022, EXECUTIVE A forwarded an email to LEE JR. with information about a new USPS contract solicitation. EXECUTIVE A stated, "Please interpret the RFP and show us box specs, quantities, and delivery locations…" LEE JR. then called **LEE**.

27. On or about June 17, 2022, EXECUTIVE A forwarded to **LEE**'s personal account an email from a USPS contracting official seeking pricing improvements. EXECUTIVE A's email stated, "I am inclined to lower east to $1.26 - can't lower the west. What do you think[?]" **LEE** replied, "You can lower the east and also state that you can run both east and west from the east and we pick up the freight."

## II. USPS Contracts with COMPANY B

28. On or about September 12, 2019, GRIFFIN emailed COMPANY B executives regarding a draft bid proposal for a USPS contract. GRIFFIN stated in part:

> Just got off an hour long conversation with [**LEE**] and [**LEE**] gave me a lot of information – There are 15 Corrugated Suppliers involved in this bid including [two other competitors.] [**LEE**'s] guidelines for the highest we can be is Box 4 $ 195 / 1000[;] LFRB $ 465 / 1000[;] Box 7 $ 520 / 1000[.]
>
> My suggestions would be to look at $ 190 , $ 457 and $ 517 and see if you can live with those[.] I'm not going to cut my commission below 2 %[.]

29. On or about October 25, 2019, GRIFFIN emailed COMPANY B executives:

> I just talked with [**LEE**] about the bid[.] [**LEE**] said the technical evaluation is done and we scored very well – Pricing looks like this[:] #4 we are number 2[;] #7 we are number 3[;] LFRB we are number 2[.] [**LEE**] doesn't know the exact numbers only the positions[.] There could be some adjustment for Geographical locations and technical factor scoring. [**LEE**] thinks [a USPS procurement official] will give us a last chance within a week or so I'm guessing we should go down 5 % but it's your call -how low you really want to go[.] Jim

30. On or about December 6, 2019, GRIFFIN emailed COMPANY B executives regarding COMPANY B's bid proposal, stating:

> I just got off the phone with [**LEE**]. He says Denver [referring to the USPS's contracting office location] will be contacting me next week for final pricing[.] [**LEE**] really doesn't want [competitor] to stay in there - I believe [**LEE**] and think [**LEE**] is trying to help us Box 4 we should be good if we drop 4%[.] LFRB looks like we need to be under 420 to have a shot[.] Box 7 is similar[.]
>
> It looks like on both of those we need to drop 5 %[.] Don't know if other guys will drop as well[.] [**LEE**] thinks if we price at those levels we will at least get some of the biz[.] Our technical evaluation score was very high so we could get an award without having the lowest price[.] Let's talk Monday if possible[.] Thanks Jim

31. On or about December 9, 2019, GRIFFIN emailed other COMPANY B executives regarding COMPANY B's bid, stating: "My suggestion after talking with [**LEE**] on Friday night is we lower the prices[.] Box 4 (4%)[;] Box 7 (5%)[;] LFRB (6%)[.]" Let's talk about it sometime today[.] [T]hanks Jim[.]"

32. On or about July 1, 2020, **LEE**, using a personal cellphone, had a call with GRIFFIN that lasted approximately 15 minutes. A few hours later, LEE JR. added a company registered to GRIFFIN as a LCG client. LEE JR. then emailed a $9,500 "retainer" invoice to GRIFFIN. LEE JR. also texted GRIFFIN, stating in part: "Jim, Hope you and the family are well. Got up with [**LEE**] and just sent you over the invoice. Let me know if this works. . . ."

33. Between in or about September 2020, and in or about March 2021, **LEE** provided COMPANY B with confidential information, including pricing information for competitors' bids, in connection with a USPS solicitation for express mail boxes.

34. On or about October 16, 2020, **LEE** signed a USPS conflicts of interest and non-disclosure agreement related to the USPS solicitation for express mail boxes. **LEE** served as the technical evaluation team's chairperson on the solicitation.

35. On or about December 4, 2020, **LEE** submitted his evaluation of the proposals to the USPS procurement office, along with the technical evaluation team's consensus evaluation. Both technical evaluations ranked COMPANY B the highest of four offerors with a score of 10 out of 10 possible points.

36. On or about December 28, 2020, **LEE**, using his personal cellphone, called GRIFFIN and had a lengthy conversation. Approximately two hours later, GRIFFIN emailed COMPANY B executives, informing them where COMPANY B's bid stood in comparison to

other bidders on the USPS solicitation and proposing a modified bid with a different pricing structure. Thereafter, COMPANY B modified its bid proposal, including pricing information, and the USPS awarded the express mail box contract to COMPANY B on or about March 1, 2021. The contract's minimum value was $375,000, and its maximum value was $14.5 million.

37. On or about March 9, 2021, **GRIFFIN** called **LEE**'s personal cellphone and had a conversation that lasted approximately 13 minutes. Approximately an hour later, **GRIFFIN** called LEE JR and had a call that lasted approximately 40 minutes. The following day, LEE JR. emailed GRIFFIN, attaching a $9,500 LCG invoice to Griffin and Associates, a consulting entity operated by GRIFFIN. GRIFFIN paid the invoice on or about March 29, 2021.

38. Between in or about July 2021 and in or about January 2022, LEE JR. assisted COMPANY B in obtaining contract renewals, including price increases, on two USPS contracts previously awarded to COMPANY B. At least two of LEE JR.'s emails referenced his discussions with **LEE**, who was serving as the COR for each of these contracts.

39. On or about July 28, 2021, **LEE**, using a personal cellphone, called GRIFFIN. The call lasted approximately 20 minutes. Approximately an hour later, GRIFFIN texted another COMPANY B official discussing the need to start working on USPS contract renewals. GRIFFIN stated in part, "[LEE] wants us to do a negotiated contract renewal vs. going through the entire bid process. We will use [LEE JR's] consulting business to help us write up a formal proposal for the USPS[. . . .]" GRIFFIN then emailed LEE JR, asking for LEE's assistance in obtaining the USPS contract renewals. GRIFFIN also texted PERSON A stating in part, "If you, me and [LEE JR] work together and are successful in getting contract renewals (with [**LEE**'s] approval) you will be

part of it all moving forward[.] We may have to keep paying [LEE JR.] some bullshit $ fee but what the hell – who cares[.]"

40. On or about September 8, 2021, LEE JR. emailed GRIFFIN regarding the USPS contract renewals, stating in part: "After discussing with **LEE**], [**LEE**] has advised now is the time to get this in the works."

41. On or about September 28, 2021, LEE JR. texted **LEE**, stating in part that LEE JR. had sent a revised proposal to GRIFFIN.

42. On or about October 1, 2021, after LEE JR. and GRIFFIN shared draft contract extension proposals (for which **LEE** had provided input), LEE JR. emailed GRIFFIN, providing suggestions based on a meeting that LEE JR. had that afternoon with the "senior consulting staff." The "senior consulting staff" was a reference to **LEE**.

43. On or about October 20, 2021, LEE JR. emailed GRIFFIN, attaching a $9,275 LCG invoice to Griffin and Associates. GRIFFIN paid the invoice on or about November 3, 2021.

44. On or about October 26, 2021, on the same day that GRIFFIN emailed USPS contracting officials with a "cost savings proposal" for two of COMPANY B's contracts and requesting to renew both contracts, **LEE** and GRIFFIN texted each other and **LEE** indicated that he [**LEE**] would influence the other USPS officials.

45. On or about October 28, 2021, **LEE** texted GRIFFIN, stating that COMPANY B's proposal "looked pretty good[.] I wonder why[?]" GRIFFIN replied, "Ha. ha."

46. On or about October 28, 2021, **LEE** emailed the USPS contracting officials expressing support of GRIFFIN's cost savings proposal. Thereafter, between in or about November 2021 and in or about December 2021, **LEE** emailed USPS contracting officials and

advocated in support of renewing COMPANY B's contracts at a 20 percent cost increase. USPS contracting officials ultimately extended both of COMPANY B's contracts (with the 20 percent increase recommended by **LEE**) effective January 1, 2022.

47. On or about December 22, 2021, after receiving a text message regarding the price increase and contract extension proposals from GRIFFIN, **LEE** texted GRIFFIN, stating in part, "[a USPS procurement official] did reach out to me. I concur[ed] with your documentation Monday…So yes you were good and I'm working on a five-year extension for you. Three-year base with 2 [1-year] options."

48. On or about February 10, 2022, in response to a text message regarding the price increase and contract extension proposals from GRIFFIN, **LEE** texted GRIFFIN, stating, "I agree and make sure prices reflect it…[LEE JR.] will do a write up based on this that a 2nd grader can understand"

49. On or about May 6, 2022, GRIFFIN texted LEE, stating, "You should probably be the head of the committee that reviews all this bid stuff…" LEE replied, "I am and will be the chair person[.]"

50. On or about June 28, 2022, GRIFFIN sent two text messages to **LEE**, stating, "[a USPS procurement official] just sent me an email confirming the extension of our two expiring contracts until 8/23/23…It [was] like pulling a mule up a hill - …maybe one loaded with Rocks" and, later, telling **LEE**, "Well you pushed the dang mule up the hill !!"

51. On or about July 27, 2022, **LEE** texted GRIFFIN, stating, "That last increase you just got I had to concur with it with [a USPS procurement official] and [their] team. They asked

me if the 13% was a good deal even though you asked for 20[.] I put in writing they're lucky to even get it for that…I'll keep taking care of you. Have a great day sir".

52. On or about November 2, 2022, **LEE** and GRIFFIN had two telephone calls. GRIFFIN later emailed LEE JR., stating: "I spoke with [**LEE**] [t]oday about starting to get you up and running on our bid project. . . ." GRIFFIN also invited LCG (LEE JR.) to visit COMPANY B's facilities in Michigan.

53. On or about November 3, 2022, GRIFFIN texted **LEE**, stating, "I'm setting up [LEE JR.] to fly up to Flint Thursday Dec. 1 – do dinner and overnight then meetings at [COMPANY B] and plant tours Friday Send him back to DC Friday afternoon…You want to come too?" **LEE** replied, "Will look into it."

54. On or about November 7, 2022, GRIFFIN texted **LEE**, stating, "You got any idea on when our technical answers and stuff might need to be turned in? Feb, March? I'm working on promo video of [COMPANY B] to turn in with the other stuff but won't be able to get it finished before Feb." **LEE** replied, "I can drag my feet cause you got lots to do."

55. On or about December 1, 2022, and January 25, 2023, GRIFFIN texted **LEE**, asking for COMPANY A's pricing on a contract that COMPANY B wanted to take over.

56. On or about February 16, 2023, **LEE** received an email from a USPS procurement official related specifications for an upcoming EPS standard packaging solicitation. Minutes later, **LEE** texted GRIFFIN, asking if he was good with the specifications. After GRIFFIN replied that the specifications were acceptable, **LEE** emailed the USPS procurement official, stating, "Yes I concur with the below and I have revised and added the recycled content portion into the attached specifications."

57. On or about March 6, 2023, GRIFFIN texted **LEE**, stating, "Any update on when the bid thing is coming out? Ain't seen nothing yet." **LEE** replied, stating, "Well was supposed to come out last week then I saw issues…Stay tuned and I'm sure your consultant is working hard ahead of time for you."

58. On or about April 14, 2023, GRIFFIN forwarded LEE JR. an email from USPS contracting officials related to a solicitation for EPS priority mail and priority mail express boxes. GRIFFIN stated in the email, "Here we go."

59. On or about April 16, 2023, GRIFFIN emailed LEE JR. and other COMPANY B representatives regarding the USPS solicitation and LEE JR.'s role with the bid proposal. Thereafter, between on or about April 17, 2023, and on or about April 28, 2023, LEE JR., GRIFFIN, and other COMPANY B representatives communicated frequently regarding COMPANY B's bid proposal.

60. On or about April 28, 2023, and on or about May 13, 2023, LEE JR. emailed EXECUTIVE B, attaching draft versions of COMPANY B's bid proposal.

61. On or about May 9, 2023, **LEE** texted GRIFFIN: "You may want to do 2 things[:] 1) Have [LEE JR.] do a complete look over to make sure you get high scores[.] 2) send it Monday next week because [USPS contracting official] is out till then[.] Just a thought[.]"

62. On or about May 10, 2023, **LEE**, using a personal cellphone, called GRIFFIN and had a conversation that lasted approximately 69 minutes.

63. On or about May 10, 2023, GRIFFIN texted LEE JR., stating: "I just got off the phone with [**LEE**]. Will be sending you our final (or almost final) draft of the responses to the Technical questions this afternoon for your review[.] I think everything is pretty damn good and

can't imagine any of these yahoos doing a better job. LEE JR. responded, "Agreed 100% I will get right on it."

64. On or about May 13, 2023, after receiving an email from GRIFFIN with COMPANY A's final bid proposal, LEE JR. emailed GRIFFIN with proposed edits to COMPANY B's bid proposal. GRIFFIN submitted COMPANY B's bid to a USPS contracting official on May 15, 2023.

65. On or about June 2, 2023, LEE JR. called GRIFFIN and had a conversation that lasted approximately 69 minutes. GRIFFIN then attempted to call **LEE**. **LEE**, using a personal cellphone, called GRIFFIN and had a conversation that lasted approximately 19 minutes.

66. On or about June 14, 2023, after GRIFFIN received an invoice from LEE JR. and LCG, GRIFFIN made a payment to LEE JR. and LCG totaling approximately $20,175.

67. On or about August 6, 2023, GRIFFIN emailed LEE JR., stating: "[**LEE**] told me [he's] saving up for a Elk hunt trip. Kind of a bucket list thing- We have Elk herds here in Northern Michigan and I completely understand. How about if we figure out a way to make sure [**LEE**] gets [**LEE's**] trip[.] If OK with you I could send you a bonus $$and you could use it to buy [**LEE**'s] trip - No need to tell [**LEE**] where it came from other than it came from you[. . . .]"

68. On or about August 10, 2023, GRIFFIN emailed LEE JR., stating: "The best and final pricing is due Wednesday August 16. Keep your ear to the ground for any noises you might hear."

69. On or about August 10, 2023, after GRIFFIN emailed LEE JR. stating that COMPANY B's "best and final pricing" for the USPS contract solicitation was due in six days, LEE JR. emailed GRIFFIN to coordinate a call for "the three of us[.]"

70. On or about August 11, 2023, GRIFFIN texted LEE JR., stating in part, "Let me know if you hear anything about our pricing[.]" Approximately one minute later, LEE JR. texted **LEE**, stating, "When do you want to talk with [GRIFFIN]?" **LEE**, using a personal cellphone, called LEE JR. approximately one minute later. At or near the conclusion of the call, LEE JR. texted GRIFFIN, suggesting they talk on August 14, 2023.

71. On or about August 14, 2023, LEE JR. called GRIFFIN; GRIFFIN then called **LEE**'s personal cellphone; and GRIFFIN emailed a COMPANY B executive, advising that COMPANY B should stand down regarding its bid proposal until receiving "feedback" regarding bidding and pricing information. GRIFFIN advised in subsequent emails that he was waiting to hear back from LEE JR. with either "an update or no new info[.]"

72. On or about August 16, 2023, shortly after GRIFFIN and COMPANY B submitted a revised bid proposal to USPS procurement officials, GRIFFIN texted **LEE**:

**GRIFFIN**: Just sent in my pricing. - Scraped the bottom of the barrel until it was shiny[.] Total price reduction of 11.5 % from current[.] Pretty good -you can continue to get really good boxes and the best service on Earth and save a boatload of money at the same time[.] That's a win -win[.]

**LEE**: I got everything crossed on my body for you brother_ That sounds good.

**GRIFFIN**: Thanks pal!

**LEE**: I think things will work out.

73. On or about August 23, 2023, **LEE**, as chairperson of the technical evaluation team, emailed the evaluation for the EPS contract to the USPS contracting office. The technical evaluation team rated COMPANY B's bid proposal the best of five bids, with **LEE** giving COMPANY B's bid proposal a perfect score.

74. On or about August 24, 2023, GRIFFIN emailed a COMPANY B executive regarding COMPANY B's revised bid proposal:

> Just talked with [**LEE**]. Said it will be a couple of weeks before decision is made[.] [**LEE**] still hasn't seen the pricing but said [**LEE**] was told today by [USPS contracting official] that it is very competitive - so we didn't blow anyone away[.] We are shining in the technical submission part[.] Smoked everyone in the Sustainability section – [**LEE**] says that's really important right now[.] I'll let you know when I hear more[.]

75. On or about October 31, 2023, LEE JR. texted **LEE**, stating in part "Any movement on [EXECUTIVE B's] business?" **LEE** responded, "Call on Friday about that[.]" The USPS awarded the EPS contract (valued at approximately $680 million) to COMPANY B on or about December 20, 2023.

## III. <u>USPS Contract with COMPANY C</u>

76. On or about June 1, 2020, **LEE**, using a personal cellphone, had a call with EXECUTIVE C1 that lasted approximately seven minutes. Soon after the call, LEE, JR. created a new LCG customer account for COMPANY C and emailed a LCG invoice for $4,000 to EXECUTIVE C1's personal email address. LEE JR. continued to send monthly invoices to EXECUTIVE C1 and EXECUTIVE C2, totaling approximately $58,556.25, through in or about mid to late 2021.

77. Between on or about September 10, 2020, and on or about September 28, 2020, **LEE** had multiple phone calls with EXECUTIVE C1 during a period when COMPANY C was preparing a bid proposal for a USPS contract involving specialized packaging. LEE, JR., during this period, also communicated with EXECUTIVE C2 regarding COMPANY C's bid proposal and kept track of **LEE**'s hours.

78. On or about November 13, 2020, **LEE** emailed the USPS contracting office with the technical evaluation team's evaluation of the bid proposals for the EPS specialized packaging solicitation. The evaluation scored COMPANY C the best of eight bids.

79. On or about January 12, 2021, a day after a USPS contracting official emailed COMPANY C and invited it to provide "improvements in [COMPANY C's] proposed prices" for the EPS specialized packaging solicitation, **LEE** and EXECUTIVE C1 had a telephone call that lasted approximately eight minutes; LEE JR. and EXECUTIVE C2 had a telephone call that lasted approximately 13 minutes; and EXECUTIVE C2 texted LEE JR. with COMPANY C's updated prices for the USPS contract solicitation. LEE JR. replied in part, "call me this morning please."

80. Between on or about February 8, 2021, and on or about February 9, 2021, **LEE**, LEE JR., EXECUTIVE C1, and EXECUTIVE C2 each had multiple telephone calls with one another. COMPANY C also emailed revised pricing to USPS contracting officials for the EPS Specialized Packaging solicitation.

81. On or about March 3, 2021, **LEE**, using a personal cellphone, had a call with EXECUTIVE C1 that lasted approximately six minutes. The call occurred shortly after **LEE** received internal notice that the USPS was "recommending award to a new supplier called [COMPANY C]. . . . The estimated 7-yr contract value is $5.6M[.]" **LEE** and LEE JR. had three calls on the same day.

82. On or about June 24, 2021, **LEE**, using a personal cellphone, had a call with EXECUTIVE C1 that lasted approximately 14 minutes. Following that call, **LEE** texted LEE JR., stating, "If you can talk in a few just talked to [EXECUTIVE C1]." Minutes later, there was a ten-minute call between **LEE** and LEE JR.

83. On or about September 6, 2021, around the time that EXECUTIVE C1 ceased to be employed at COMPANY C, **LEE**, using a personal cellphone, had a call with EXECUTIVE C1 that lasted approximately seven minutes. Later that night, **LEE** texted LEE JR., stating, "Don't send anything to [EXECUTIVE C2] PER [EXECUTIVE C1]...Not sure what's going on..." Following that exchange, there were no additional payments from COMPANY C to LCG.

## IV. USPS Contracts with COMPANY D

84. On or about April 4, 2023, **LEE** and LEE JR. had multiple telephone calls shortly after **LEE** received notice that: (a) the USPS was going to issue a solicitation for an EPS labels contract; and (b) **LEE** was going to serve as the chairperson for the technical evaluation team.

85. On or about April 5, 2023, LEE JR. texted EXECUTIVE D1, stating in part: "[N]eed to inform you of a large label RFQ coming out which I will have LCG consulting work up for you." LEE JR. texted another message to EXECUTIVE D1, stating, "If we can have a 5 minute discussion at some point today or tomorrow that would be helpful!" EXECUTIVE D1 responded, "Will do[.]"

86. On or about April 6, 2023, **LEE**, using a personal cellphone, called EXECUTIVE D2. The call lasted approximately 17 minutes. EXECUTIVE D1 called LEE JR. later that day. The call lasted approximately 38 minutes.

87. Between on or about June 28-29, 2023, after **LEE** received notice that the USPS had issued the EPS labels solicitation to COMPANY D and other prospective suppliers, **LEE**, using a personal cellphone, had lengthy calls with EXECUTIVE D1 and EXECUTIVE D2.

88. On or about July 20, 2023, after LEE JR. received portions of COMPANY D's updated bid proposal, LEE JR. texted **LEE**, stating he would "[b]e there in 15." A few hours later,

**LEE** texted LEE JR., stating, "Review done" and "It will be with your chair." LEE JR. responded, "Coming over now."

89. On or about July 21, 2023, after LEE JR. emailed EXECUTIVE D1 and EXECUTIVE D2, attaching revised draft of COMPANY D's bid proposal, LEE JR. texted **LEE**, stating: "Got edits sent off by 8am this morning. Asked to have them back by COB today and face to face final review on Tuesday prior to submission."

90. On or about July 23, 2023, LEE JR. and **LEE** met in-person, after which LEE JR. emailed EXECUTIVE D1 and EXECUTIVE D2, attaching edits to COMPANY D's draft bid proposal.

91. On or about July 26, 2023, after EXECUTIVE D2 submitted COMPANY D's bid proposal to the USPS, EXECUTIVE D2 called **LEE**'s personal cellphone. The call lasted approximately 20 minutes.

92. On or about August 1, 2023, LEE JR. emailed EXECUTIVE D1, attaching an LCG invoice for approximately $5,587. The invoice mentioned a "senior consultant," which was a reference to **LEE**.

93. On or about August 7, 2023, approximately two hours after LEE JR. and EXECUTIVE D1 exchanged text messages regarding an LCG invoice, LEE JR. texted **LEE**, stating: "[W]e're good with [EXECUTIVE D1's] stuff in the month of august for payment."

94. On or about August 23, 2023, **LEE** attempted to call EXECUTIVE D2, prompting EXECUTIVE D2 to text **LEE**, stating, "All ok?" **LEE** responded, "Yes just got questions…Talk in AM."

95. On or about August 23, 2023, **LEE** emailed the technical evaluation team's evaluation to USPS contracting officials, scoring COMPANY D the best of four bids.

96. On or about August 29, 2023, [EXECUTIVE D2] texted **LEE**, stating: "Got [an] email from [another USPS official] asking for better pricing. Where we need to be % wise?" **LEE** responded, "Talk in the morning?" and "Get [EXECUTIVE D1] on also."

97. On or about August 30, 2023, **LEE**, using a personal cellphone, attempted to called EXECUTIVE D2. Soon thereafter, EXECUTIVE D2 called **LEE**'s personal cellphone. The call lasted about 20 minutes.

98. On or about August 31, 2023, LEE JR. texted **LEE**, stating: "Me, [EXECUTIVE D1] and [EXECUTIVE D2] speak next week on solution for meltaway label for poly/paper envelopes." **LEE** responded, "Don't mess that up that could be a game changer for LCG[.] We have to talk ahead of time in detail[.] That's also something to go to packaging exchange with[.]" After LEE JR. responded, "Ok", **LEE** stated, "You have to shine on this in great detail and bring sustainability value to [EXECUTIVE D1 that EXECUTIVE D1] will understand."

99. In or about October 2023, after the USPS awarded the EPS labels contract to COMPANY D for two of the three groups of EPS labels featured in the solicitation, **LEE** began serving as the COR. The USPS estimated the five-year base award to be $4,190,982. The contract also contained a four-year option period and had a maximum total value of $15 million.

18 U.S.C. § 371
18 U.S.C. § 201(b)(1)(A) & (B)
18 U.S.C. § 201(b)(2)(A) & (B)
18 U.S.C. § 1343
18 U.S.C. § 1346

**FORFEITURE ALLEGATION**

The United States further alleges that:

100. Pursuant to Federal Rule of Criminal Procedure 32.2(a), notice is given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §§ 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), as a result of the defendant's conviction under any of the offenses in Count One of the Information.

**Conspiracy Forfeiture**

101. Upon conviction of the alleged offenses in Count One of the Information, the defendant, **JAMES E. LEE, SR.**, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, that constitutes or is derived directly or indirectly, from gross proceeds traceable to the commission of the offenses.

**Substitute Assets**

102. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant,

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 18 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

18 U.S.C. § 853(p)
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(b)(1)
28 U.S.C. § 2461(c)

Date: 09/16/2026

Edward P. Sullivan
Acting Chief, Public Integrity Section
U.S. Department of Justice